34 F.3d 1068
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Otis KIRKLAND, Jr., Defendant-Appellant.
 Nos. 93-2231, 93-2313.
 United States Court of Appeals, Sixth Circuit.
 Aug. 22, 1994.
 
 Before: KEITH, NORRIS, and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant Kirkland appeals his conviction pursuant to a 21-count indictment arising from a conspiracy to obtain money from the City of Detroit Board of Education. For the reasons set forth below, we affirm.
 
 
 2
 * Defendant Otis Kirkland was charged with conspiring with James O'Banion to fraudulently obtain $216,851.31 from the Board of Education of the City of Detroit.[1] The indictment alleged that the money stolen was under the control of the Board of Education of the City of Detroit, which is an organization that receives federal benefits in excess of $10,000.00 in any one year period.[2] The indictment alleged that O'Banion, an agent of the Board of Education,[3] issued checks to various vendors and distributed those checks to Kirkland, who then deposited the checks into the Manufacturers National Bank, after forging the endorsements of the vendor-payees. A total of eleven checks were listed in the indictment. The checks involved three vendors, Ogden Distributors, Inc., Lofton Limited, Inc., and Smith Welding and Supply Inc., who sold supplies to the Board of Education.
 
 
 3
 Kirkland is the owner of Micro-Time Systems, Inc., which supplied materials such as calculators, typewriters, computers, and copiers to the Board of Education. Kirkland testified that his company experienced financial difficulty due to the Board of Education's tardiness in paying its bills and that he informed O'Banion that his business was about to file for bankruptcy. Kirkland told O'Banion that he could cash "any check" regardless of whose name was on it and O'Banion eventually gave Kirkland a check payable to a vendor other than Kirkland. Kirkland encountered difficulties cashing the check and the check had to be reissued. Kirkland then cashed the check, and gave a package to O'Banion that contained between eight and nine thousand dollars in cash. Ultimately, O'Banion gave Kirkland a total of eleven such checks.
 
 
 4
 A staff accountant for the Board of Education testified that eight of the eleven checks were not legitimate debts of the Board of Education. These eight checks were generated by creating false debts from old bills of the Department of Education. The remaining three checks were for legitimate debts the Board of Education owed Ogden Distributors, Inc. The vice-president in charge of loss prevention at Kirkland's bank, testified that all eleven checks were deposited into Kirkland's Micro-Time Management Systems account.
 
 
 5
 O'Banion testified that he gave the three legitimate checks to Kirkland because Kirkland told him that he was taking over Ogden and was authorized to take the checks. O'Banion contacted the president of Ogden who told him that Kirkland was authorized to review Ogden's account and he interpreted it to mean that Kirkland was authorized to receive checks on Ogden's behalf. Both Ogden's president and bookkeeper testified that Kirkland was not, in fact, authorized to accept checks on behalf of Ogden.[4] Ogden's president testified that the amounts listed on the three checks were the amounts owed to Ogden by the Board of Education; that she never received the proceeds of the checks; and that the endorsements on the checks were forgeries.
 
 
 6
 The Lofton Company was listed as the payee on five of the eight illegitimate checks. The president of Lofton testified that the checks were not related to legitimate debts owed to Lofton by the Board of Education; that he did not endorse the checks; and that Kirkland was not authorized to accept these checks on behalf of Lofton.
 
 
 7
 The Smith Welding and Supply Company was listed as the payee on one of the illegitimate checks. The check was endorsed "Devaughn Smith." The president of Smith Welding testified that his company did not receive the check; that the check did not represent a legitimate debt owed to his company by the Board of Education; that Kirkland was not authorized to accept checks on behalf of Smith Welding; and that no one named "Devaughn Smith" worked for his company.
 
 
 8
 FBI Special Agent James Hoppe testified that Kirkland voluntarily submitted to an interview with the FBI on September 6, 1991. In the interview, Kirkland claimed that he received the Ogden checks from an employee at Ogden and that, since he was buying the company, he felt comfortable endorsing the name of Ogden's president on the check. Kirkland also stated that he received the Lofton checks from the owner of Lofton who was his close friend at the time. Kirkland admitted signing the owner's name on the checks and depositing them into his Micro-Time account. Agent Hoppe testified that when he brought the Smith Welding check to Kirkland's attention, Kirkland replied, "[i]f I'm guilty of any of them, this is the one I'm guilty on." Kirkland stated that he received the Smith Welding check in the mail with another check payable to his company and that he endorsed the check with the name "Devaughn Smith," a name he made up. When Agent Hoppe questioned the veracity of Kirkland's explanation of how he obtained the checks since the checks were deposited into his account either on the same day or the day after the checks were dated Kirkland admitted that he had obtained the checks directly from someone at the Board of Education.
 
 
 9
 Kirkland presented seven character witnesses and testified in his own defense at trial. During closing argument, the prosecutor stated that there are many prominent citizens "that could call on an army of character witnesses would never walk to a dishonest dollar if they could run to it." The jury found Kirkland guilty on all counts charged. On May 3, 1993, Kirkland filed, motions for judgment of acquittal, for a new trial, for arrest of judgment and for other post verdict relief, which were denied. A sentencing hearing was held on August 31, 1993 and defendant was sentenced to 54 months imprisonment on each count to be served concurrently; a special assessment of $1,000.00; restitution in the amount of $216,851.31, less the amount of money owed to defendant by the Board of Education; and three years supervised release. This appeal followed.
 
 II
 A. REFUSAL OF PSYCHIATRIC EXAM
 
 10
 Kirkland's first argument on appeal is that the district court erred in refusing to order a psychological or psychiatric examination of James O'Banion. Kirkland contends that ample evidence was presented to the district court showing O'Banion's incompetency to testify at trial. On March 31, 1993, Kirkland filed a motion for a physical and psychological examination of O'Banion. Kirkland based his request on Fed.R.Crim.P. 12.2 and at trial added Fed.R.Crim.P. 16(a)(1)(c) as a basis for his request.
 
 
 11
 It is clear that both Fed.R.Crim.P. 12.2 and 16 apply only to defendants. Kirkland's argument that O'Banion is a "defendant" since he was a co-defendant in the underlying crime is not persuasive. O'Banion was not a defendant in this action and neither Fed.R.Crim.P. 12.2 nor 16 applies to him.
 
 
 12
 The district court, citing United States v. Moreno, 899 F.2d 465, 470, (6th Cir.1990), ruled that "any inconsistencies in O'Banion's testimony or any impairment of his recollection properly are questions of his credibility, not of his competency as a witness." The district court found that nothing presented to the court (other than Kirkland's subjective belief) supported a finding that O'Banion's emotional problems would effect his competency.
 
 
 13
 This Court has stated, "[w]hat must be remembered, and is often confused, is that 'competency' is a matter of status not ability." United States v. Ramirez, 871 F.2d 582, 584 (6th Cir.1989). This Court may reverse the district court's decision regarding the status of O'Banion only if there is a clear abuse of discretion. Id. The district court did not abuse its discretion in refusing Kirkland's request for a psychiatric evaluation of O'Banion and in permitting him to testify.
 
 
 14
 B. SUFFICIENCY OF EVIDENCE FOR 18 U.S.C. Sec. 1957 COUNTS
 
 
 15
 Kirkland's second argument on appeal is that the evidence presented at trial was insufficient to convict him on the 18 U.S.C. Sec. 1957 counts.[5] Kirkland contends the government presented insufficient evidence of his knowledge and intent to commit the offense. Under 18 U.S.C. Sec. 1957 the government must prove that Kirkland "(1) knowingly engaged or attempted to engage in a monetary transaction involving criminally derived property, (2) with such property valued at more than $10,000, and (3) with such money actually being derived from specified criminal activity." United States v. Campbell, 777 F.Supp. 1259 (W.D.N.C.1991).
 
 
 16
 In reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Circumstantial evidence can be sufficient to support a jury's determination. United States v. Scruggs, 549 F.2d 1097, 1104 (6th Cir.), cert. denied, 434 U.S. 824 (1977). In this case, the evidence presented to the jury revealed that Kirkland had full knowledge that he had derived the eleven checks he deposited into his Micro-Time account from criminal activity; the checks were valued far in excess of $10,000; and the checks were actually derived from a specified criminal activity (i.e. that contained in 18 U.S.C. Sec. 666).
 
 
 17
 Kirkland also argues that in United States v. Johnson, 971 F.2d 562 (10th Cir.1992), the court held that a conviction under 18 U.S.C. Sec. 1957 requires a defendant to have the proceeds from the underlying criminal activity in his possession before engaging in the monetary transaction. In Johnson, the Tenth Circuit reversed the defendant's conviction for money laundering because the alleged "criminally derived property", wire transfers to the defendant, was also the underlying criminal activity, wire fraud. This Court has stated "[w]e do not think the holding announced in Johnson should be applied beyond its limited context." United States v. Griffith, 17 F.3d 865, 878 (6th Cir.1994). The district court effectively distinguished Johnson from the facts of this case stating:
 
 
 18
 Unlike Johnson, the criminally derived property referred to in this case arose from a prior fraud or theft of the checks from the Board of Education. As such, the crime was completed when Kirkland obtained the checks by fraud or theft. The subsequent negotiation, deposit, transfer, or exchange of the checks into his or his company's account took place after the underlying criminal activity had occurred and hence, involved criminally derived property. It is clear that the negotiation, deposit, transfer or exchange of checks from the Sec. 666(a)(1)(A) violation did not constitute an element of that offense. See United States v. Hollis, 971 F.2d 1441, 1451 n. 4 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1580 (1993).
 
 
 19
 It is clear that Kirkland completed the underlying crime prior to depositing the money into his company's account. The government offered sufficient evidence to convict Kirkland under 18 U.S.C. Sec. 1957.
 
 C. DOUBLE JEOPARDY
 
 20
 Kirkland's third argument on appeal is that his convictions under 18 U.S.C. Sec. 1957, engaging in a monetary transaction involving criminally derived property, violated the double jeopardy clause of the Fifth Amendment, because the other offenses of which he was convicted, 18 U.S.C. Sec. 371 and 18 U.S.C. Sec. 666(a)(1)(A), are the essence of the Sec. 1957 offenses. Kirkland also claims that his conviction under 18 U.S.C. Sec. 666(a)(1)(A) for stealing from a program receiving federal funds is the same offense as his 18 U.S.C. Sec. 371 conspiracy conviction.
 
 
 21
 This Court has held that the double jeopardy clause protects against multiple punishments for the same offense. United States v. Schuster, 769 F.2d 337, 340 (6th Cir.1985) cert. denied, 475 U.S. 1021 (1986). The Supreme Court has stated:
 
 
 22
 The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.
 
 
 23
 Blockburger v. United States, 284 U.S. 299, 304 (1932).
 
 
 24
 The conspiracy conviction under 18 U.S.C. Sec. 371 is distinguishable from the Sec. 1957 and the Sec. 666 convictions. The Supreme Court has stated:
 
 
 25
 It is settled law in this country that the commission of a substantive offense and a conspiracy to commit it are separate and distinct crimes, and a plea of double jeopardy is no defense to a conviction for both.... Only if the substantive offense and the conspiracy are identical does a conviction for both constitute double jeopardy.
 
 
 26
 Pereira v. United States, 347 U.S. 1, 11 (1954). The district court stated, "the substantive offense of engaging in a monetary transaction involving criminally derived property does not require more than one person for its commission or an agreement." The charge of conspiracy in this case is distinct from the substantive offenses since it requires proof of distinct facts regarding the involvement of more than one person that the substantive offenses do not require.
 
 
 27
 Distinguishing the Sec. 1957 convictions and the Sec. 666 convictions is more difficult since the Sec. 666 offense is an essential element the government must prove in order to establish the Sec. 1957 violations. However, Sec. 1957 is distinct from Sec. 666 because it requires proof of the additional fact that a monetary transaction occurred once funds were illegally obtained under Sec. 666. We also find that Congress intended to create two distinct crimes. The Supreme Court noted "the question is one of legislative intent, the Blockburger presumption must of course yield to a plainly expressed contrary view on the part of Congress." Garrett v. United States, 471 U.S. 773, 779 (1985). The Tenth Circuit found "Congress intended 1957 to be a separate criminal offense which is punishable in addition to the underlying 'specified unlawful activity'." United States v. Lovett, 964 F.2d 1029, 1042 (10th Cir.1992). Logically this must be true or else Sec. 1957 would serve only as an alternative charge for each "specified unlawful activity" listed in the statute and not a separate criminal offense. There is no evidence that Congress intended to create only an alternative and not a separate and distinct offense. Accordingly, Kirkland's convictions do not violate the double jeopardy clause.
 
 
 28
 Kirkland also claims that it was improper to sentence him using the offense level under 18 U.S.C. Sec. 1957 instead of under 18 U.S.C. Sec. 666. Kirkland contends that he is being punished more harshly simply because he deposited an "inappropriately obtained check" in his company's account. The Sentencing Guidelines state, "[w]hen the counts involve offenses of the same general type to which different guidelines apply (as an example, theft and fraud), apply the offense guideline that produces the highest offense level." USSG Sec. 3D1.3(b). The district court correctly applied the guidelines in utilizing the higher offense level required for a violation of 18 U.S.C. Sec. 1957.
 
 D. INCRIMINATING STATEMENTS TO THE FBI
 
 29
 Kirkland's fourth argument on appeal is that the district court erred in allowing statements he made to an FBI agent to be admitted during trial. Kirkland contends that the statements were involuntary and that the FBI agent failed to give Miranda warnings. The district court found Kirkland was not in custody at the time of the challenged interrogation since there was no evidence that Kirkland was not free to leave. The court found as well that the confession was voluntary.
 
 
 30
 A confession is voluntary if it is the product of an essentially free and unconstrained choice by its maker. Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973). The court must look to the nature and length of the interview, and whether the police conduct was oppressive or the authorities used psychological tactics. See Davis v. North Carolina, 384 U.S. 737 (1966). In this case, none of these aggravating circumstances were present. The district court was correct in finding Kirkland's statements to be voluntary.
 
 
 31
 A Miranda warning is required if an individual is the subject of police custodial interrogation. Miranda v. Arizona, 384 U.S. 436 (1966). The police element is present since Kirkland was interviewed by FBI Special Agent Hoppe. The interview was clearly an interrogation since Agent Hoppe expressly questioned Kirkland. Rhode Island v. Innis, 446 U.S. 291 (1980) (interrogation is defined as express questioning or its functional equivalent). In this case, it is the custody prong that fails.
 
 
 32
 In order to determine whether an individual was in custody, we must determine whether a reasonable suspect would have felt free to go. Berkemer v. McCarty, 468 U.S. 420 (1984). In denying Kirkland's motion to suppress, the district court found that "a reasonable person, would not or should not have believed that he was in custody." The district court noted that the questioning occurred prior to the commencement of this case; Kirkland was not under arrest or any other form of detention at the time; Kirkland appeared at the FBI office voluntarily;[6] Kirkland was accompanied by a friend who is an attorney (though there was no attorney/client relationship during the interview); and that there was no evidence that Kirkland was not free to leave the interrogation room at anytime during the questioning. The fact that Kirkland appeared voluntarily at the police station weighs heavily against a finding of custody. See Oregon v. Mathiason, 429 U.S. 492 (1977). Also, in United States v. Warner, 971 F.2d 1189, 1202 (6th Cir.1992), this Court held that Miranda warnings were not required where the person questioned by police "was not under arrest or under any restraint, even though she was a suspect." Accordingly, the district court was correct in finding that Miranda warnings were not required since Kirkland was not in custody.
 
 
 33
 E. SUFFICIENCY OF EVIDENCE FOR 18 U.S.C. Sec. 666(a)(1)(A) COUNTS
 
 
 34
 Kirkland's fifth argument on appeal is that there was insufficient evidence presented at trial to convict him under 18 U.S.C. Sec. 666(a)(1)(A). Kirkland contends that the government did not establish the existence of an organization or local government which received benefits in excess of $10,000 from the federal government during a one-year period or that property with a value of $5,000 or more was owned, under the care of or in the custody or control of the organization at the time of the alleged unlawful conduct. In reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Circumstantial evidence may be sufficient to support the jury's determination. United States v. Scruggs, 549 F.2d 1097, 1104 (6th Cir.), cert. denied, 434 U.S. 824 (1977).
 
 
 35
 Kirkland argues that the Board of Education is not an "organization" or "government agency" as defined by the statute.[7] The district court found that "[t]estimony established that the Board of Education was created to oversee the public education of the citizens of the City of Detroit which is a governmental function, and is subject to the control of the City of Detroit." The district court concluded that the Detroit Board of Education is an "organization" as used in 18 U.S.C. Sec. 666(a). We find that, viewed in a light most favorable to the government, sufficient evidence existed for a rational trier of fact to find this element of the crime beyond a reasonable doubt.
 
 
 36
 Kirkland also asserts that the government failed to establish the receipt of federal funds by the Board of Education in excess of $10,000 within a one year period. Kirkland argues that since the City of Detroit is the holder of the Board's bank accounts, the funds do not go to the Board of Education but rather, to the City of Detroit. Walter Jones, Jr., Deputy Superintendent for Financial and Business Services for the Board of Education testified that, in fiscal year 1991, the Board of Education received approximately $80 million in federal funds. Evidence that the City of Detroit may control the Board's bank account is to be expected since it is undisputed that the Board is subject to the control of the City of Detroit. The money from the federal government is for the Board and is for educational purposes. Accordingly, when viewed in the light most favorable to the prosecution, a reasonable jury could find that the Board of Education received in excess of $10,000 within a one-year period.
 
 F. PROSECUTOR'S COMMENTS
 
 37
 Kirkland's sixth argument on appeal is that the prosecutor's editorial comment regarding his character witnesses improperly prejudiced the jury. The prosecutor said, "yet, unfortunately, you have the prominent and some of the prominent that could call on an army of character witnesses would never walk to a dishonest dollar if they could run to it." Kirkland contends that this remark was meant to inflame the jurors to convict a prominent person with many character witnesses. No objections were made at the time of the statement or at the end of the government's argument out of the presence of the jury.
 
 
 38
 In the absence of an objection, this Court will review district court rulings for plain error. United States v. Causey, 834 F.2d 1277, 1281 (6th Cir.1987). "Plain errors are limited to those harmful ones that are so rank that they should have been apparent to the trial judge without objection, or that strike at the fundamental fairness, honesty, or public reputation of the trial." Id. In this case, the government argues that the statement was made to rebut Kirkland's argument regarding the "standing alone" value of character evidence and that it was intended to persuade the jury that the ability to produce character witnesses was not always dispositive.
 
 
 39
 The Supreme Court has stated "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 U.S. 1, 11 (1984). The comment that Kirkland complains of here is not an expression of the prosecutor's personal belief about the innocence or guilt of the defendant, the egregious type of comment which we addressed in United States v. Bess, 593 F.2d 749 (6th Cir.1979). Nor is this single remark, made by the prosecutor in response to the defendant's argument that character evidence standing alone can raise a reasonable doubt, the kind of prosecutorial misconduct which could be said to have a serious tendency to mislead the jury or prejudice the defendant when considered in the context of the entire trial and the strength of the evidence against him. See United States v. Leon, 534 F.2d 667, 679 (6th Cir.1976). This comment does not constitute plain error.
 
 G. CHARACTER EVIDENCE INSTRUCTION
 
 40
 Kirkland's seventh argument on appeal is that the district court erred in failing to give a specific instruction regarding character evidence. Kirkland contends that the district court should have given the Michigan Compiled Jury Instruction, which Kirkland requested, that provides that evidence of good character may, by itself, create a reasonable doubt of guilt or justify a verdict of not guilty. In the alternative, Kirkland argues that the district court at least should have given Sixth Circuit Pattern Jury Instruction 7.09 regarding the character and reputation of the defendant. The district court declined to give either instruction.
 
 
 41
 The standard of review for jury instructions on appeal is whether the charge, "taken as a whole, fairly and adequately submits the issues and applicable law to the jury.... A judge does not commit error because he or she fails to use the language contained in a request, so long as the instruction given is accurate and sufficient." United States v. Martin, 740 F.2d 1352, 1361 (6th Cir.1984), cert. denied, 472 U.S. 1029 (1985). (citations omitted).
 
 
 42
 At trial, defendant challenged the proposed jury instructions due to the lack of an instruction on character evidence. Defendant admitted that prior to reviewing the court's proposed jury instructions, he had not provided the court a proposed instruction on character evidence. The district court stated:
 
 
 43
 I looked through the Sixth Circuit's pattern jury instruction, and I find nothing that deals with character witnesses. I looked at the instructions which are in your possession now, most of which are patterned after the Sixth Circuit pattern jury instructions. It is my belief that the instructions contained therein sufficiently cover character witnesses. The standard for assessing the content of the character witness' testimony is essentially the same. I know of no reason to change that.
 
 
 44
 The trial court then asked for a proposed instruction from the parties. In response, defendant submitted the Michigan Compiled Jury Instructions' "standing alone" character instruction; he did not submit or request Sixth Circuit Pattern Jury Instruction 7.09.[8] After studying the instruction submitted by defendant, the court reiterated that the proposed instructions already adequately "cover the basic responsibility of a juror in assessing a witness's testimony." Thus, a specific character witness instruction was unnecessary.
 
 
 45
 Kirkland now argues that Sixth Circuit Pattern Jury Instruction 7.09 should have been given by the court. The instruction states:
 
 
 46
 You have heard testimony about the defendant's good character. You should consider this testimony, along with all the other evidence, in deciding if the government has proved beyond a reasonable doubt that he committed the crime charged.
 
 
 47
 Sixth Circuit Pattern Jury Instruction 7.09. It is clear from the language of this instruction that it does not add anything to the jury's general instruction for witness testimony. Rather, character evidence is to be considered "along with all the other evidence." This is something the jury would already do under the general instructions for witness testimony. As the district court noted, "[t]he standard for assessing the content of the character witness' testimony is essentially the same." Thus, a specific instruction for character witnesses was not necessary. The absence of the character witness instruction did not prevent the jury from considering this evidence, it merely prevented the evidence from being highlighted as the defendant requested.
 
 
 48
 We find that, when taken as a whole, the jury instructions fairly and adequately submitted the issues and applicable law to the jury. Accordingly, the district court did not err in refusing to give a specific character witness instruction.
 
 H. GOOD FAITH INSTRUCTION
 
 49
 Kirkland's final argument on appeal is that he was entitled to a good faith (or claim of right) instruction since he lacked criminal intent and believed in good faith that he had a right to the checks. Defendant requested that a claim of right instruction be given to the jury and presented the court with Michigan Criminal Jury Instruction 7:3:01. The district court stated, "I have rejected this proposed instruction because I do not believe the evidence as presented conforms with the claim of right ... as a bottom line, I do not believe that there is evidence to indicate that Mr. Kirkland ... took the property honestly believing it to be legally his own or that he had a legal right to its possession."
 
 
 50
 As stated in the previous section, the standard of review for jury instructions on appeal is whether the instructions, "taken as a whole, fairly and adequately submits the issues and applicable law to the jury." Martin, 740 F.2d at 1361. In this case, the jury instructions actually given by the court presented the elements of the charged crimes and the requirement of the knowing participation of the defendant stating, "[a] requirement of this crime is that the defendant knew that the property involved in the transactions represented proceeds from some form ... of activity which constitutes a felony under state or [f]ederal law." We find that the instructions fairly and adequately stated the applicable law.
 
 III
 
 51
 For the foregoing reasons, the conviction and sentence imposed by the district court is AFFIRMED.
 
 
 
 [1]
 Kirkland and O'Banion were charged in a 31-count indictment. Kirkland was charged in 21 of those counts: one count of conspiracy to commit an offense against the United States in violation of 18 U.S.C. Sec. 371; ten counts of theft concerning programs receiving federal funds in violation of 18 U.S.C. Sec. 666(a)(1)(A); and ten counts of engaging in monetary transactions with property derived from a specified unlawful activity in violation of 18 U.S.C. Sec. 1957(a)
 
 
 [2]
 The Deputy Superintendent for financial and business services testified that during fiscal year 1991, the Board of Education received approximately eighty million dollars in federal money
 
 
 [3]
 O'Banion worked for the Board of Education for 24 years, the last twelve as Accounts Payable Supervisor
 
 
 [4]
 O'Banion also provided Kirkland with two checks in which Ogden was the payee but they were not related to legitimate debts owed to Ogden by the Board of Education
 
 
 [5]
 The statute reads in pertinent part:
 Sec. 1957. Engaging in monetary transactions in property derived from specified unlawful activity
 (a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).
 * * *
 (f) As used in this section--
 (3) the term "specified unlawful activity" has the meaning given that term in section 1956 of this title.
 The definition of "specified unlawful activity" contained in Sec. 1956 cites 18 U.S.C. Sec. 666 as one of the applicable unlawful activities. 18 U.S.C. Sec. 1956(c)(7)(D).
 
 
 [6]
 The parties dispute the nature of a telephone conversation between Agent Hoppe and Kirkland. Kirkland alleges that Hoppe threatened to arrest him or place him in handcuffs if he didn't cooperate. Hoppe denies these charges. The district court found that regardless of the content of the telephone conversation, Kirkland voluntarily appeared at the FBI office
 
 
 [7]
 The statute states:
 The term "government agency" means a subdivision of the executive, legislative, judicial or other branch of government including a department, independent establishment, commission, administration, authority, board, and bureau, and a corporation or other legal entity established, and subject to control, by a government or governments for the execution of a governmental or intergovernmental program;
 18 U.S.C. Sec. 666(d)(2).
 
 
 [8]
 This Court has ruled that "standing alone" character instructions are not necessary even when requested by a party. Poliafico v. United States, 237 F.2d 97, 114 (6th Cir.1956), cert. denied, 352 U.S. 1025 (1957); United States v. Huddleston, 811 F.2d 974, 977 (6th Cir.1987), aff'd, 485 U.S. 681 (1988). The district Court's refusal to give a "standing alone" character instruction was not error as such an instruction was not warranted under the law